UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STELLA & JOHN SCHAUFFERT,

    Plaintiffs,

     v.

UNITED STATES OF AMERICA,

    Defendants.

Civil Action No. 02-0592 (CKK)

**MEMORANDUM OPINION**
(September 18, 2005)

Plaintiffs brought this medical malpractice action against Defendant United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, based upon the alleged negligent acts and omissions of military personnel and staff physicians employed by the United States of America at Walter Reed Medical Center ("Walter Reed") in Washington, D.C.  Pursuant to the terms of the FTCA, which does not provide for a jury trial, a three-day bench trial commenced on October 26, 2004, continued on October 27, 2004, and concluded on October 29, 2004.  This Memorandum Opinion details the Court's findings of fact and conclusions of law, as required by Federal Rule of Civil Procedure 52(a). *See* Fed. R. Civ. P. 52(a) ("In all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon"); *see also* 28 U.S.C. § 2402.  Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2) because the acts of negligence and omission alleged in the Complaint took place at Walter Reed, which is located within the District of Columbia.  Plaintiffs exhausted their administrative appeals as required by 28 U.S.C. § 2675(a).

Based upon the credible evidence adduced at trial and all reasonable inferences to be drawn from the testimony of the witnesses and the documentary evidence in the case, the Court concludes that the physicians employed by Defendant at Walter Reed (1) properly obtained Ms. Schauffert's informed consent before performing surgery on her, and (2) met the standard care of reasonably prudent practitioners in the District of Columbia acting under the same or similar circumstances in providing care to Mrs. Schauffert.  As such, pursuant to Federal Rule of Civil Procedure 58, the Court shall enter judgment in favor of Defendant and shall dismiss this action with prejudice.

## I: PRELIMINARY FINDINGS OF FACT

At trial, Plaintiffs narrowed the claims originally forwarded in their Complaint to essentially an action seeking to recover for a failure by the relevant physicians to obtain her informed consent when conducting an operation on Mrs. Schauffert that ultimately constituted a bilateral salpingo-oophorectomy and total abdominal hysterectomy, which involved the complete removal of Mrs. Schauffert's ovaries, fallopian tubes, and uterus.  Essentially, Plaintiffs assert that (1) the physicians at Walter Reed failed to inform Mrs. Schauffert of the nature of the operative plan, 10/27/04 Tr. at 173:12-20, and (2) failed in their duty to inform her of the option to retain as much ovarian tissue as possible, *id.* at 163:24-25, 164:1-6, 166:14-167:25.  After listening to the testimony in the case, reviewing the evidentiary record, personally observing the demeanor and credibility of the witnesses, and making all reasonable inferences to be drawn therefrom, the Court sets forth the following findings of fact.

A.      *Undisputed/Uncontroverted Facts*

**<u>Background</u>**

1.  Plaintiff Stella Schauffert is the spouse of Plaintiff John Schauffert, a retired Air Force

Lieutenant Colonel who was stationed in Naples, Italy in July 1999.  10/27/05 Tr. at 177:2-20.

While on active duty in the Air Force, Lieutenant Colonel Schauffert was a military policeman

and served as a commander of military police units during four (4) of his military assignments.

*Id.* at 193-94.

2.  While Mrs. Schauffert's native language is Italian, she began studying English when

she was eleven (11) years-old, has lived in the United States for significant periods of time since

she was twenty-six (26) years-old, and is fluent in English.  10/26/07(a) Tr. at 28:5-6, 20.[1]  Prior

to marrying her husband, Lt. Col. John Schauffert, Mrs. Schauffert received formal legal training

in Italy.  J. Tr. Ex. 24 at 26.  Mrs. Schauffert and her husband have been married to each other

three (3) times extending over a period of roughly twenty (20) years.  10/26/04(a) Tr. at 21:21-

23.

**<u>The Discovery of Mrs. Schauffert's Medical Issues</u>**

3.  In early May 1999, Mrs. Schauffert experienced excruciating pelvic pain after

intercourse.  Her pain was so intense that her husband had to pick her up and carry her to the car,

and then carry her into the emergency room of the United States Naval Hospital in Naples, Italy.

10/27/04 Tr. at 199:3-7; J. Tr. Ex. 9 at 3-6.  At the time of her admission, Mrs. Schauffert was

forty years-old (40), had an eighteen (18) year-old son by her husband, and did not intend to have

---

[1] The Transcript for the first day of trial, October 26, 2004, is divided up into a "morning session" and an "afternoon session."  The Court shall cite the morning session as "10/26/04(a) Tr." and the afternoon session as "10/26/04(b) Tr."

any further children.  10/26/04(a) at 31:12-15; J. Tr. Ex. 1 (Treatment Record Cover); J. Pre-Tr.
Stmt., J. Undisputed Fact #1.  Upon examination, her attending physicians believed that Mrs.
Schauffert was suffering from Pelvic Inflammatory Disease ("PID") and prescribed an antibiotic
treatment regimen for that condition.  J. Tr. Ex. 9 at 3.

4.  Mrs. Schauffert was given a referral that ultimately led to an appointment with Dr.
Lauren Bales, an Obstetrician and Gynecologist ("OB/GYN") at the Navy clinic in Naples, Italy.
*Id.*  On June 24, 1999, Mrs. Schauffert underwent an ultrasound of her pelvic area.  *Id.* at 7.
When Mrs. Schauffert met with Dr. Bales to discuss the results of the ultrasound on July 6, 1999,
it was revealed that the ultrasound detected a mass on Mrs. Schauffert's right ovary.  *Id.* at 1, 7.
Dr. Bales described the mass as a "large complex cystic mass," measuring 5.6 x 4.1 x 7.1 cm,
with septations -- i.e., the mass had compartments or walls within the cyst.  *Id.* at 7.  At the time,
Dr. Bales believed that it was likely that Mrs. Schauffert was suffering from a complex
hemorrhagic cyst.  *Id.* at 1; J. Pre-Tr. Stmt., J. Undisputed Fact #4.

5.  Dr. Bales ordered a CA-125 blood test for Mrs. Schauffert in order to test for cancer
markers and ascertain whether the cystic mass may be cancerous.  Mrs. Schauffert's test received
a score of 46, which is considered an "elevated" score.  J. Tr. Ex. 9 at 8; J. Pre-Tr. Stmt., J.
Undisputed Fact #5.  Based on her examination, symptoms, ultrasound, and CA-125 findings,
Dr. Bales informed Mrs. Schauffert that she had a small chance of having cancer.  J. Tr. Ex. 9 at
1; J. Pre-Tr. Stmt., J. Undisputed Fact #7.  Plaintiffs' expert, Dr. Charles Seigel, testified in his
trial deposition that the percentage chance of a forty (40) year-old woman with a complex
ovarian cyst having cancer is approximately thirty percent (30%).  J. Tr. Ex. 20 (Seigel Dep.) at
54:10-13; J. Pre-Tr. Stmt., J. Undisputed Fact #11.

6.  Despite her belief that Mrs. Schauffert had a relatively small chance of having cancer, Dr. Bales suggested that Mrs. Schauffert have surgery due to the presence of pain and laboratory abnormalities.  J. Tr. Ex. 9 at 1; 10/29/04 Tr. at 20:12-15.  Dr. Bales also counseled Mrs. Schauffert on the option of follow-up and close observation without surgical intervention, but did not recommend it.  J. Tr. Ex. 9 at 8; 10/26/04(b) Tr. at 48:22-24.  Dr. Bales told Mrs. Schauffert that surgery would entail the removal of the right ovary and an evaluation of the left ovary.  10/29/04 Tr. at 20:16-19.  Dr. Bales did not inform Mrs. Schauffert that she would attempt to remove the cyst from the right ovary and allow her to retain as much tissue as possible because Dr. Bales did not consider that course of action to be a medically viable option within the standard of care.  *Id.* at 20:20-21:2.

7.  During discussions with Dr. Bales, Mrs. Schauffert asked several questions regarding what the planned surgery entailed, and agreed to undergo the proposed surgery.  *Id.* at 21:5-10.  As such, Mrs. Schauffert left Dr. Bales's office on July 6, 1999 with the understanding that she was going to have surgery, 10/26/04(a) Tr. at 58:7-10, and surgery was scheduled for a later point in July 1999 at the Naples hospital, *id.* at 48:17-19, 49:1-9.  However, Mrs. Schauffert ultimately decided against having surgery at the Naples facility due to its relatively small size and the fact that it was not staffed with OB/GYN oncologists.  *Id.* at 59:6-13.

### *Travel to Walter Reed Army Medical Center in the United States*

8.  As an alternative, Mrs. Schauffert chose to travel to Walter Reed Army Medical Center in Washington, D.C., where gynecologic oncologists would be available to conduct her surgery.  *Id.*  Mrs. Schauffert was flown via medical evacuation at government expense to Walter Reed.  *Id.* at 59:1-18, 62:3-9; J. Tr. Ex. 4 at 29.  Prior to her flight, Dr. Bales contacted Dr.

Michael Sundborg, the Gynecological Oncology Fellow at Walter Reed, to discuss Mrs.

Schauffert's treatment and to ensure that Walter Reed would receive her.  J. Tr. Ex. 9 at 8; J. Tr.

Ex. 4 at 30.  Mrs. Schauffert also spoke to Dr. Sundborg on the telephone regarding her treatment

and the plans for her evacuation to Walter Reed.  10/26/04(b) Tr. at 62:14-25.  Prior to her arrival

at Walter Reed, Mrs. Schauffert conducted research and reviewed the medical literature

concerning her condition, and considered herself "educated" on the issues surrounding her

surgery.  J. Tr. Ex. 2 at 31:1-25.

### *The July 20, 1999 Examination and Counseling Session*

9.  Mrs. Schauffert arrived at Walter Reed on July 20, 1999, and met with Dr. Jay

Carlson, an experienced, well-published, board-certified gynecologic oncologist, J. Tr. Ex. 15 at

4, and Dr. Shad Deering, a resident in his third year of his OB/GYN rotation, 10/29/04 Tr. at

45:8-10.  *See* 10/26/04(b) Tr. at 63:1-25.  Drs. Carlson and Deering performed a physical

examination of Mrs. Schauffert, which included a pelvic vaginal ultrasound.  10/29/04 Tr. at

53:7-12.  Dr. Remenga, another board-certified gynecological oncologist, was also present for the

examination and signed off on the report of the physical examination.  The ultrasound revealed

that Mrs. Schauffert now had bilateral complex adnexal masses, both with septations.  J. Tr. Ex.

1 at 11.  The left cyst was estimated to be 5.2 x 4.3 cm, and the right cyst was estimated to be 5.6

x 3.1. cm.  *Id.*  Moreover, the ultrasound revealed a small 1.6 cm polyp on the interior posterior

of the uterus.  *Id.*

10.  The Walter Reed physicians considered the fact that the ultrasound showed two (2)

ovarian cysts to be very significant, as the previous ultrasound -- conducted by Dr. Bales in Italy

-- had revealed only one complex cyst.  10/27/04 Tr. at 56:23, 57:6; J. Tr. Ex. 20, Seigel Dep. at

26:23, 27:1-5.  The presence of bilateral masses is an indicator for cancer.  10/27/04 Tr. at 108:4-17.  Upon conclusion of this examination, Drs. Carlson, Deering, and Remenga had a discussion with Mrs. Schauffert regarding the examination results and possible courses of treatment at roughly 10:00 a.m that day, i.e., July 20, 1999.  *Id.* at 57:23, 58:6.  During this discussion, which was led by Dr. Remenga in Walter Reed's OB/GYN clinic, *id.* at 96:13-25, 97:1-22, Mrs. Schauffert was informed that her evaluation revealed that she had bilateral adnexal masses whose appearance suggested a possible ovarian malignant neoplasm.  J. Tr. Ex. 1 at 9-10.  Mrs. Schauffert was also told that she had a suspicious mass in her uterus that was evaluated on sonohysterogram.  10/26/04(b) Tr. at 67:13-15.

    11.  Mrs. Schauffert was informed that, based on the examination findings, her age, and an elevation in her CA-125 count, there was a thirty percent (30%) risk that she had cancer.  10/26/04(b) Tr. 67:21-24.  Mrs. Schauffert was very scared at the prospect of having cancer.  *Id.* at 68:12-14.  The physicians inquired as to whether Mrs. Schauffert planned on having more children, and were told by her that she did not plan on any future pregnancies.  10/27/04 Tr. at 59:18-21.

    12.  Given their findings and Mrs. Schauffert's age, CA-125 count, and desire for no further children, the physicians discussed several courses of treatment with Mrs. Schauffert.  10/27/04 Tr. at 59:22, 60:8.  Mrs. Schauffert was not on any medication at the time of this counseling.  10/26/04(b) Tr. at 89:2-6.  Three options were discussed at length.  10/29/04 Tr. 59:11-60:8, 98:4-11; J. Tr. Ex. 1, 17, 86; J. Pre-Tr. Stmt., J. Undisputed Fact #13.  <u>First</u>, Mrs. Schauffert and the physicians discussed the possibility of close physician follow-up and monitoring, which would have entailed serial ultrasounds, examinations, and possible therapy

with tumor markers.  10/27/04 Tr. at 59:25, 60:2.  Mrs. Schauffert rejected this option, as it could

not guarantee that she would be free of cancer.  10/26/04(b) Tr. at 76:17-23.  Second, because

Mrs. Schauffert had a suspicious mass inside her uterus, the physicians discussed with her the

option of having a hysteroscopy, using a transvaginal approach.  10/27/04 Tr. at 60:3-5.  This

approach would allow the surgeon to look inside the uterine cavity, evaluate the uterine mass,

potentially remove it and see if that was a focus of cancer, and then perform an abdominal

procedure to evaluate the ovaries.  Id.  Mrs. Schauffert rejected this option as well.  Id. at 61:9-

14.  Third, the physicians discussed with Mrs. Schauffert the option of (1) a laparotomy, which is

an abdominal incision, to remove any visible tumors, (2) with an abdominal hysterectomy, which

was explained as the total removal of the uterus, (3) and also with a bilateral salpingo-

oopherectomy, which was explained as the total removal of both ovaries and associated tubes,

and (4) possibly a staging procedure to see if the cancer had spread, with the addition of

chemotherapy-radiation as needed.  10/27/04 Tr. at 61:18-23, 66:6-19, J. Tr. Ex. 1 at 17.

13.  Upon discussion with Mrs. Schauffert, the physicians at Walter Reed believed that

she had selected the third option.  As such, on 3:20 p.m. that day -- July 20, 1999 -- Dr. Deering

presented Mrs. Schauffert with a form entitled "A Request for Administration of Anesthesia and

for Performance of Operations and Other Procedures."  J. Tr. Ex. 11.  On this "consent" form,

Dr. Deering outlined the planned surgical procedure in detail.  Id.  In the block entitled

"Operation and Procedure," Dr. Deering wrote "exploratory laparotomy, bilateral salpingo-

oopherectomy, total abdominal hysterectomy, possible staging operation."  Id.  In the section

labeled "Statement of Request," Dr. Deering wrote:  "To make incisions in the abdomen to

evaluate and remove one or both ovaries/the mass/possibly uterus/fallopian tubes/lymph nodes/

8

omentum/pelvic washings." *Id.*  The form continued: "Risks to include bleeding/transfusion/ damage to other organs with need for more surgery/infection." *Id.*  Dr. Deering also wrote that the operating team was to include Drs. Deering, Rose, and Remenga. *Id.*  Below the section filled out by Dr. Deering, a block reads: "I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above, and hereby request such procedure(s) be performed." *Id.*  In this section, Mrs. Schauffert signed her name in the presence of a witness after reading the entire contents of the form. *Id.*

### *The July 21, 1999 Counseling Session and Operation*

14.  The next day -- July 21, 1999 -- Mrs. Schauffert was examined by Dr. Cynthia Macri, the United States Navy's Senior Gynecologic Oncologist at Walter Reed and a board-certified OB/GYN oncologist.  J. Tr. Ex. 12.  Dr. Macri was going to be the operating surgeon on Mrs. Schauffert. *Id.*  With Dr. Deering present, *id.*, 10/26/04(b) Tr. at 89:7-12, Dr. Macri discussed the nature of the surgery with Mrs. Schauffert, who indicated that she wanted and consented to the procedure discussed the previous day. J. Tr. Ex. 12; 10/27/04 Tr. at 11-12.  Mrs. Schauffert's only concern during this counseling session was whether her surgery necessitated a horizontal rather than vertical incision -- Mrs. Schauffert desired a horizontal scar for cosmetic reasons.  J. Tr. Ex. 1 at 19; 10/27/04 Tr. at 140-46.

15.  Immediately after this conversation, Dr. Macri made the following entry in Mrs. Schauffert's medical records: "40 year-old with bilateral complex adnexal masses, and elevated CA-125.  I have discussed with her the possibility of cancer, given the complex nature of her adnexal masses.  I have discussed vertical midline decision and need for adequate exposure for possible surgical staging, risks and benefits discussed.  Patient voiced understanding, although

apprehensive, and desires to proceed as planned." Jt. Tr. Ex. 1 at 19; 10/27/04 Tr. at 141.

16.   Due to the change in Mrs. Schauffert's surgical team from Drs. Deering, Rose, and Remenga to Drs. Deering, Macri, Sundborg, and Ochoa, a second consent form was required. J. Tr. Ex. 11, 12; 10/29/04 Tr. at 74:22, 75:1. Mrs. Schauffert was provided a second consent form before her surgery on July 21, 2004, which read on the first handwritten line: "Exploratory Laparotomy/Total Abdominal Hysterectomy/Bilateral Salpingo-oophorectomy with possible staging." J. Tr. Ex. 12. The form also reads: "plan is to remove uterus, fallopian tubes, ovaries, the mass, and possibly lymph nodes, and any other involved tissue or organs." *Id.* Mrs. Schauffert signed this consent form. *Id.*

17.   At trial, Mrs. Schauffert admitted that she read the description of the surgical plan as provided on the July 21, 1999 consent form. 10/26/04(b) Tr. at 89:18-22. She also testified that she remembered reading the entire contents of this form and signing the consent. *Id.* at 90:1-3. Moreover, she admitted at trial that she consented to the surgery and surgical plan as detailed on the consent form when she signed the consent form. *See* 10/26/04(b) Tr. at 90:4-15, 11:15 (Q: "And by signing [the second consent form], did you consent to having your ovaries and uterus removed?"; A: "It is a consent form, yes."; Q: "Did you consent when you signed this form? [The second consent form]?"; A: "Yes.").

18.   Plaintiff's expert, Dr. Charles J. Seigel, in his trial deposition, testified that the two consent forms provided to Mrs. Schauffert appropriately described the procedure that took place, and that he would not have written them any differently. J. Tr. Ex. 20 (Seigel Dep.) at 55:16-20, 56:9-23.

19.  Mrs. Schauffert never asked or expressed a desire to have as little ovarian or reproductive tissue removed as possible.  10/26/04(b) Tr. at 77:25, 78:13.

20.  On July 21, 1999, Dr. Deering -- under the supervision of Dr. Macri -- performed the exploratory laparotomy.  J. Tr. Ex. 1 at 86.  Upon opening the abdomen, Dr. Deering observed that Mrs. Schauffert's left ovary had a large hemorrhagic cyst, which was apparently ruptured; however, there was no way to ascertain the degree or extent of the rupture.  J. Tr. Ex. 1 at 87; 10/27/04 Tr. at 161:17-21; J. Pre-Tr. Stmt., J. Undisputed Fact #14.  The left ovary was removed and tested for malignancy.  J. Tr. Ex. 1 at 87.  The pathology report concerning the left ovary revealed, upon cross-sectioning, a 1 cm cyst.  *Id.* at 74.  This 1 cm cyst was a separate and distinct cyst from the ruptured large hemorrhagic cyst that Dr. Deering visually observed and was contained within the remainder of the left ovary, which was removed and sent for testing. 10/27/04 Tr. at 164:24-25, 165:1-2; 10/29/04 Tr. at 118:20-25, 119:1-7.  Mrs. Schauffert's right ovary also contained a hemorrhagic cyst that was green in appearance, surrounded by fibrous tissue, and adhered to the abdominal wall.  J. Tr. Ex. 1 at 86-87.  The right ovary was also removed and then tested for malignancy.  *Id.*  The tissue from both the left and right ovaries were determined to be benign based on the pathology reports.  *Id.* at 74.  The surgical team ultimately performed a bilateral salpingo-oophorectomy and total abdominal hysterectomy, which involved the complete removal of Mrs. Schauffert's ovaries, fallopian tubes, and uterus.  *Id.* at 86-87.

### *After the Operation*

21.  After she recovered from the surgery and was discharged from Walter Reed, Mrs. Schauffert met with Dr. Deering.  10/27/04 Tr. at 83:8-25, 84-86.  At this meeting, Mrs. Schauffert's only complaint was that the scar from her abdominal incision was not straight, as it

was skewed approximately 3-4 millimeters at the inferior edge.  *Id.* at 88:4-23; *see also*
10/24/04(b) Tr. at 6:8-25 (Mrs. Schauffert admits during trial that her only complaint to Dr.
Deering after surgery was the alignment of her scar).  Mrs. Schauffert was quite upset that her
scar was not straight, and voiced her desire to have a plastic surgeon fix the scar.  *Id.*  Her
complaint regarding the scar is noted in visits to her doctors in October-December 1999.  *Id.*
Mrs. Schauffert did not complain to Dr. Deering about the removal of both of her ovaries.  *Id.*

22.   Between August 1999 and June 19, 2000, Mrs. Schauffert had at least eighteen (18)
documented discussions with her primary physician and primary care providers.  None of her
medical records from this period indicate that she raised any complaint about her claimed non-
consent to the removal of her ovaries.  Rather, the first time Mrs. Schauffert's complaint about
the removal of her ovaries is noted in her medical records is on June 19, 2000 -- eleven (11)
months after her surgery.  J. Tr. Ex. 5 at 93.  Mrs. Schauffert testified that she did not make any
complaints to medical personnel regarding her surgery because she was told by her husband, then
an active-duty officer in the military, that she could not sue his employer -- i.e., the United States
government.  10/26/04(b) Tr. at 6:3-5, 7:6-9.  Her husband, John Schauffert, testified that he was
familiar with the mechanisms for initiating complaints and investigations within the military;
however, at no time did he make any official complaint regarding the conduct of the surgery in
this case.  10/29/04 Tr. at 13:20-22.

23.   Mrs. Schauffert has been diagnosed as a "hypochondriac."  10/27/04 Tr. at 34:23-25,
35.  She has also been diagnosed as displaying "obsessive-compulsive" symptoms.  J. Tr. Ex. 24
at 22.  Plaintiff has experienced problems with short-term memory loss as early as 2001,
10/27/04 Tr. at 37:7-25, J. Tr. Ex. 24 at 23, and testified that it is difficult for her to separate

what she knows now from what happened at the time of the surgery.  10/26/04(b) Tr. at 52:19-25; 10/27/04 at 30:3-8.  Mrs. Schauffert's psychiatrist -- Dr. Habib Nathan -- made an entry in her psychiatric records opining:  "[T]his unexpected hysterectomy is becoming a legal issue between patient and military doctors and patient may hold onto symptoms for secondary gain." J. Tr. Ex. 24 at 20.

24.    After her surgery, which removed both of her ovaries, both fallopian tubes, and her uterus, Mrs. Schauffert experienced a number of side effects from the hormone therapy treatment on which she was placed.  Specifically, she testified that (1) the frequency and quality of her sexual intercourse with her husband has greatly decreased, *see* Pls.' Suppl. Proposed Findings of Fact at 14, ¶ 54; and she suffers from (2) vaginal dryness, *id.* at 14, ¶ 55; (3) pelvic pain, *id.* at 14, ¶ 56; (4) hot flashes and night sweats, *id.* at 14, ¶ 57; and (5) a blunting of emotions and -- alternatively -- feelings of depression, irritability, and anger, *id.* at 15, ¶ 58.  Moreover, she (1) fears that she will develop complications relating to the hormone replacement therapy required, and (2) has suffered mental and emotional anguish from the loss of her reproductive organs.  *Id.* at 15, ¶¶ 60, 62.  Finally, her husband -- John Schauffert -- notes that he has suffered the loss of his wife's affections, society, sexual relations, services, and companionship after the surgery.  *Id.* at 16, ¶ 63.

25.    In describing the effects of her surgery and the hormone treatment, Mrs. Schauffert testified that she believes that she experienced the equivalent of "female castration."  10/26/04(b) Tr. at 13:4-5.  According to Mrs. Schauffert, "My life has changed for the worse.  Sometimes I wish I had cancer."  *Id.* at 12:25-13:1.  Mrs. Schauffert noted that she feels "diminished.  I feel like my life is over.  I don't consider -- I didn't consider myself old, and now I do feel very old,

inadequate and an it.  Not a he; not a she.  An it." *Id.* at 16:14-18.

B.    *Disputed/Controverted Facts*

**<u>Counseling</u>**

1.    After Mrs. Schauffert's evaluation on July 20, 1999, her physicians -- Drs. Carlson, Deering, and Remenga -- discussed possible options with her.  According to Defendant, as to the third option discussed, i.e., "exploratory laparotomy/total abdominal hysterectomy/ bilateral salingo-oophorectomy with possible staging," Mrs. Schauffert was informed that under this option, the physicians would remove her uterus and ovaries and send them for testing during the operation to determine if there were malignant cells present.  If cancerous cells were found, they would then conduct the staging procedure, which would entail the systematic removal and dissection of lymph nodes to ascertain whether the cancer had spread.  It could include an omentectomy and bowel resections depending upon the location and extent of the tumor.  *See* Def.'s Suppl. Proposed Findings of Fact at 6-7, ¶ 15 (citing J. Tr. Ex. 11 & 12; 10/26/04(b) Tr. at 89:18, 90:15; 10/29/04 Tr. at 63:10-15).  As such, Defendant claims that "Mrs. Schauffert agreed to have both of her ovaries, fallopian tubes, adnexa, and her uterus completely removed and then to have a staging procedure if there was any evidence of malignancy." *Id.* at 7, ¶ 16.

2.  In contrast, Mrs. Schauffert contends that the Walter Reed physicians "negligently failed to inform" her that "her reproductive organs would be removed . . . as a consequence of determining whether she was suffering from a cancerous condition."  *See* Pls.' Suppl. Proposed Findings of Fact at 5, ¶ 16 (citing 10/26/04(a) Tr. at 48:3-49:10, 61:25-62:21).  According to Plaintiffs, "[i]t was Mrs. Schauffert's belief, albeit an incorrect one, that during the July 21, 1999 surgery her reproductive organs were to be biopsied in place to determine if she were suffering

14

from a cancerous conidtion." *Id.* at 5-6, ¶ 18 (citing 10/26/04(a) Tr. at 48:3-49:10, 56:4-13;

10/27/04 Tr. at 29:2-23).  Underlying Mrs. Schauffert's belief that her reproductive organs could

be biopsied in place was her prior experience with breast biopsies and the counseling that she

received in Italy concerning cystectomy procedures.  *Id.* at 6, ¶ 19 (citing 10/26/04(a) Tr. at 35:2-

8, 36:8-11, 37:1-9, 56:14-57:25; 10/26/04(b) Tr. 23:18-24; 10/27/04 Tr. at 29:2-14, 31:1-32:1).

Mrs. Schauffert claims that she believed "that none of her reproductive organs would be removed

if intra-operative testing indicated that she did not have cancer."  *Id.* at 6, ¶ 21 (citing 10/26/04(a)

Tr. at 48:3-49:10, 56:4-13, 61:25-62:21; 10/26/04(b) Tr. at 73:3-14).  According to Mrs.

Schauffert, "[t]his belief was not corrected by the physicians at [Walter Reed] because they failed

to explain the plan of surgery and operative procedure to Mrs. Schauffert in reasonably sufficient

detail."  *Id.* at 6, ¶ 20 (citing 10/26/04(a) Tr. 48:3-49:10).  Moreover, she stresses that the Walter

Reed physicians failed to apprise her of "alternative courses of surgical treatment."  *Id.* at 10, ¶

34.

    3.  Mrs. Schauffert attacks the adequacy of her pre-operative counseling at Walter Reed,

noting that neither Dr. Jay Carlson nor Dr. Cynthia Macri at the time of trial had any memory of

counseling her, or had any memory of her as a patient.  *Id.* at 8, ¶ 26 (citing Carlson Dep. at

60:21-61:11; 10/27/04 Tr. 48:22-49:5, 133:1-2, 139:20-25).  She also stresses that Dr. Shad

Deering, the only other witness besides herself who claims to remember the pre-operative

counseling session, was not responsible for the counseling and was unsure about the identity of

the physician who actually conducted the counseling.  *Id.* at 8-9, ¶ 27.

    4.  Mrs. Schauffert contends that she signed the second consent form, i.e., the July 21,

1999 form, "not because the proposed operation had changed or because Mrs. Schauffert was

provided with additional counseling, but because of administrative procedures at [Walter Reed]." *Id.* at 9, ¶ 30 (citing various segments of testimony by Mrs. Schauffert).  She claims that this form was presented to her "shortly before surgery, and when she raised questions about the different wording, she was assured that the changes were not significant."  *Id.* at 9-10, ¶ 31 (same).  While she recognizes that the surgical consent forms that she signed "undeniably address[] the type of surgery that was performed" on her, she contends that these forms "do not replace proper pre-surgical patient counseling and do not absolve the [Walter Reed] physicians of the duty to explain the nature, extent and effects of a proposed surgery."  *Id.* at 10, ¶ 32.

5.  Ultimately, Mrs. Schauffert claims that "had she been counseled that the proposed surgical procedure would result in the removal of her reproductive organs, in order to determine if she was suffering from a cancerous condition, she would have declined to consent to the proposed surgery."  *Id.* at 10, ¶ 33 (citing 10/26/04(a) Tr. at 49:11-50:7, 51:7-19; 10/26/04(b) Tr. at 83:2-7).  She emphasizes that given her age, CA-125 level, and symptomatology, she should have been provided with the option of requesting that the operating physicians preserve as many of her reproductive organs as possible while still determining with a reasonable (if not absolute) degree of confidence that she was not suffering from a cancerous condition.  *Id.* at 11-12, ¶ 42 (citing Seigel Dep. at 27:17-34:15).

### *Medically Viable Options Within the Standard of Care During Surgery*

6.  Mrs. Schauffert takes issue with the "inevitability" of certain decisions made during her surgery.  She asserts that "complete removal of her reproductive organs, followed by intra-operative pathology, was not the only reasonable operative treatment course that should have been made available" to her.  *Id.* at 11, ¶ 35 (citing Seigel Dep. at 34:16-35:23).  Mrs.

16

Schauffert's theory is based on the testimony of her expert, Dr. Charles J. Seigel, who was board-certified as an gynecologist by the American Board of Obstetrics and Gynecology in 1976 but who is <u>not</u> an oncologist, has never lectured on gynecological oncology, and has authored only two articles -- published more than thirty (30) years ago -- that were unrelated to the issues of this case. *See* J. Tr. Ex. 20 (Seigel Dep.) at 9:9-14, 14:7-8, 15:12-13.

7.   Plaintiffs contend that under the circumstances of Mrs. Schauffert's surgery, "tissue from the left ovarian mass and the entire right ovary could have been removed for intra-operative pathology." *See* Pls.' Suppl. Proposed Findings of Fact at 12, ¶ 46 (citing Seigel Dep. at 32:6-16).   According to Dr. Seigel, "as long as the mass is ruptured, as long as there are no other suspicious looking areas on that same ovary, if there are no other locales or compartments of fluid, and the ovary basically looks normal, you can at least biopsy or remove a section of that mass that ruptures and do pathology on that." J. Tr. Ex. 20 (Seigel Dep.) at 32:10-16. "Because intra-operative pathology would have indicated a benign condition and because other operative findings were consistent with a benign condition, the operating physicians could have reasonably allowed Mrs. Schauffert to retain her left ovary, left fallopian tube, and uterus." *See* Pls.' Suppl. Proposed Findings of Fact at 13, ¶ 47 (citing Seigel Dep. at 38:3-40:17).   Had this occurred, and Mrs. Schauffert retained these organs, it would not have been necessary to place Mrs. Schauffert on hormone replacement therapy ("HRT"). *Id.* at 13, ¶ 48 (citing Seigel Dep. at 39:11-40:17). The failure to take this step has arguably caused Mrs. Schauffert to feel like a victim of "female castration," *id.* at 14, ¶ 52 (citing 10/26/04(b) Tr. at 12:20-13:8), and caused the numerous other damages described.

17

8. Defendant attacks Plaintiffs' theories regarding the medically viable options for a patient with Mrs. Schauffert's condition that fall within the standard of care in three ways. First, Defendant attempts to refute the testimony of Plaintiffs' expert, Dr. Seigel, with the testimony of Drs. Macri, Carlson, and Barter, all of whom are gynecologic-oncologists and experts in this specialized field. These three doctors uniformly testified that it is not within the standard of care to conduct an intra-operative biopsy of ovarian tissue, regardless of whether it is ruptured or un-ruptured, because it is impossible to ascertain with any degree of medical certainty whether the ovarian tissue left in the body contains lingering malignant cells. 10/29/04 Tr. at 111:1-21; J. Tr. Ex. 21 (Carlson Dep.) at 37-38, 42:1-21. Additionally, these doctors testified that an intra-operative, *in situ* ovarian biopsy would expose the patient to an unacceptable risk of accidentally rupturing a cancerous cyst and spilling the contents into the peritoneal cavity, increasing the patient's cancer staging and possibly spreading the cancer. 10/27/04 Tr. at 113:14-25, 114:121; 10/29/04 Tr. at 111:1-21.

9. Second, Defendant attacks the credentials of Dr. Seigel. Defendant emphasizes that Dr. Seigel (1) is not an oncologist, (2) has never lectured on gynecologic oncology, and (3) has only published two articles, which were entirely unrelated to the issues involving in this case. *See* Def.'s Suppl. Proposed Findings of Fact at 21, ¶ 27. Defendant notes that Dr. Seigel, in his trial deposition, stated that he thought obstetrical oncologists were better equipped to diagnose the risk of leaving or not leaving a cyst in the body during a surgery. *Id.* at 21-22, ¶ 28 (citing J. Tr. Ex. 20 (Seigel Dep.) at 60:3-12). Indeed, Dr. Seigel admitted that "I would defer to them [i.e., oncologists] in the present day and age as opposed to 35 years ago when I was doing it myself." J. Tr. Ex. (Seigel Dep.) at 60:4-17. According to Dr. Seigel, "my techniques are a lot

18

older now." *Id.* at 47:14.  When asked if Mrs. Schauffert was the type of patient that he would

see in his practice, Dr. Seigel stated, "I would possibly, okay.  It could be probably . . . ." *Id.* at

17:13-15.  Moreover, he stated that he would "most likely" consult with an obstetric oncologist

before feeling comfortable in handling a patient with symptoms identical to those of Mrs.

Schauffert.  *Id.* at 18:12-15, 51:17-7.  Dr. Seigel conceded a certain level of uncertainty in his

opinions, as when he was asked (1) if the standards of care varied from state to state, (2) if his

opinions involved any novel or unusual issues, and (3) if there was a different standard that

would apply to a gynecologic oncologist advising a patient like Mrs. Schauffert, Dr. Seigel

responded each time, "I don't think so."  *Id.* at 44:22-23, 45:6-8.

10.  <u>Third</u>, Defendant attempts to show how Dr. Seigel's testimony is ultimately

supportive of the testimony offered by Drs. Macri, Carlson, and Barter.  When questioned, Dr.

Seigel explicitly agreed that the two consent forms provided to Mrs. Schauffert appropriately

described the procedure that took place, and that he would not have written them any differently.

*Id.* at 55:16-20, 56:9-23.  He also noted that the best course of action for the doctors during the

surgery was to remove the right non-ruptured cyst and ovary to avoid the risk of spillage from a

malignant cyst.  *Id.* at 32:6-24.  Moreover, he also testified that if the left ovary had a remaining

cyst, as indicated by the laboratory reports in this case, then removal of the entire left ovary was

also appropriate.  *Id.* at 35:15-20, 57:17-22, 65:6-24, 81:4-15.  Finally, he agreed that if Mrs.

Schauffert's primary concern was to be cancer-free, her surgery as done by the physicians at

Walter Reed was the correct course of action, as the doctors could not have saved either ovary if

they were to obtain a definitive diagnosis of whether she had cancer.  *Id.*

## II: LEGAL STANDARDS

*A.     Jurisdiction and the FTCA*

Under the FTCA, the Government is liable for the torts of its employees in the same manner as a private party, *see* 28 U.S.C. § 2674, and that liability is determined "in accordance with the law of the place where the act or omission occurred," *see* 28 U.S.C. § 1346(b); *see also Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992).  "Law of the place" requires the court to apply the whole law of the state in which the alleged negligent acts occurred.  *Richards v. United States*,  369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *see also Franklin v. United States*, 992 F.2d 1492, 1495 (10th Cir. 1993) ("[W]e resolve questions of liability in accordance with the law of the state where the alleged tortious activity took place.") (citing *Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990)); *Lee v. Flintkoke Co.*, 593 F.2d 1275, 1278-79 n.14 (D.C. Cir. 1979).  As such, given that the negligent acts or omissions alleged to have occurred by Plaintiffs in this case occurred within the District of Columbia, the Court must apply District of Columbia law.

However, Defendant -- for the first time in its post-trial Supplemental Proposed Findings of Fact and Conclusions of Law -- asserts that Plaintiffs' claims are not properly before this Court, as they are barred by the doctrine of sovereign immunity.  *See* Def.'s Suppl. Proposed Findings of Fact at 14-16, ¶¶ 1-7.  Essentially, Defendant's argument is as follows:  while the FTCA provides jurisdiction to federal courts for claims against the United States arising out of negligence, the United States retains sovereign immunity for any "claims arising out of assault, battery, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights."  28 U.S.C. § 2680(h).  Moreover, given its "sweeping

language," this exception to the FTCA's general waiver of sovereign immunity excludes claims

that sound in negligence but "aris[e] out of" an intentional tort. *Kugel v. United States*, 947 F.2d

1504, 1507 (D.C. Cir. 1991) (quoting *United States v. Shearer*, 473 U.S. 52, 55, 105 S.Ct. 3039,

87 L.Ed.2d 38 (1985)).  In *Kugel*, the D.C. Circuit emphasized that "Section 2680(h) does not

merely bar claims *for* assault or battery; in sweeping language it excludes any claims that *arises*

*out of* assault and battery.  We read this provision to cover claims . . . that sound in negligence

but stem from a battery committed by a Government employee." *Id.* (citing *Shearer*, 473 U.S. at

55, 105 S.Ct. 3039).  Citing *Buckner v. United States*, Civ. No. 88-2003 (OG), 1989 U.S. Dist.

LEXIS, at *40 n.19 (D.D.C. July 26, 1989), for the proposition that when a doctor proceeds with

a surgical procedure or drug treatment without first obtaining the patient's consent, a battery has

occurred, *see* Def.'s Suppl. Proposed Findings of Fact at 15, ¶ 6, Defendant argues that Plaintiffs'

"claim of an unconsented [sic] to surgical procedure is not actionable through the FTCA," *id.*

(citing *Jordan v. United States*, 740 F. Supp. 810, 813 (W.D. Okla. 1990) (holding that battery

claims based on failure to obtain consent to a surgical procedure are barred by Section 2680(h),

notwithstanding 10 U.S.C. § 1089(e))).

Upon a review of the relevant case law, it is clear that Defendant's assertion that

Plaintiffs' claim falls outside of the parameters of the FTCA and is barred by the doctrine of

sovereign immunity is fundamentally without merit.  Importantly, as noted in their opening,

Plaintiffs' claim in this case is that Defendant's physicians "fail[ed] to communicate . . . the

operative plan to Stella Schauffert, and fail[ed] to communicate all of the surgical options

available to her."  10/26/04(a) Tr. at 5:18-23.  As such, Plaintiffs' claim -- as presented and

narrowed at trial -- is properly construed as a failure to obtain Mrs. Schauffert's informed

consent. *See Cleary v. Group Health Ass'n, Inc.*, 691 A.2d 148, 155 (D.C. 1997) (informed

consent claims involve the nature and risks of procedure and the nature of available alternatives

to treatment); *Crain v. Allison*, 443 A.2d 558, 562-63 (D.C. 1982) (same). "The doctrine of

informed consent in this jurisdiction is essentially a cause of action for negligence focusing on

the physician's duty to disclose material information regarding a proposed course of medical

treatment." *Buckner*, 1989 U.S. Dist. LEXIS at *40 n.19 (citing *Canterbury v. Spence*, 464 F.2d

772, 787 (D.C. Cir. 1972)); *see also Tavakoli-Nouri v. Gunther*, 745 A.2d 939, 942 (D.C. 2000)

(informed consent cases alleging the failure to disclose information sound in negligence); *Cleary*,

691 A.2d at 155 (informed consent claims actionable in negligence); *see also* W. Page Keeton, et

al., *Prosser and Keeton on the Law of Torts* § 18, 120-21 (5th ed. 1984) (recognizing that

considering informed consent cases to arise out of negligence, and thereby constituting an

exception to traditional common law battery, is now the prevailing view); 61 Am. Jur. 2d

*Physicians, Surgeons, Etc.* §§ 197, 199 (1981) (same).[2]

The Tenth Circuit best describes the difference between a claim such as Plaintiffs'

informed consent claim, which arises out of negligence, and the type of medical malpractice

battery claim focused on by Defendant:

> If treatment is completely unauthorized and performed without any consent at all,
> there has been a battery. However, if the physician obtains a patient's consent but
> has breached his duty to inform, the patient has a cause of action sounding in
> negligence for failure to inform the patient of his options, regardless of the due
> care exercised at treatment, assuming there is injury.

---

[2] The D.C. Circuit in *Canterbury v. Spence* recognized the fact that claims such as those
raised by Plaintiffs arise out of negligence, and not battery, when making the explicit distinction
between "an intentional invasion by an unauthorized operation," i.e., battery, or "a negligence
invasion [caused by the patient's] physician's dereliction of duty to adequately disclose."
*Canterbury*, 464 F.2d at 793.

*Franklin v. United States*, 992 F.2d 1492, 1496 (10th Cir. 1993) (citation omitted).  This is a vital

distinction -- "[i]f the negligence theory applies, redress against the government under the FTCA

is available."  *Id.* (citing *Haley v. United States*, 739 F.2d 1502, 1503, 1506 (10th Cir. 1984);

*Valdiviez v. United States*, 884 F.2d 196, 198, 199-200 (5th Cir. 1989); *Harbeson v. Parke Davis,*

*Inc.*, 746 F.2d 517, 521-22 (9th Cir. 1984)).  Plaintiffs' claim clearly falls outside the definition

of a common law battery when considered in this light:  Mrs. Schauffert was clearly competent to

consent to an operation, visited Walter Reed on her own accord to have an operation, and

knowingly consented to at least some kind of treatment and operation; she simply alleges that she

was not fully informed of the details and parameters of that operation and other possible options.

Her argument plainly consists of a claim that her physicians -- while obtaining some level of her

consent -- breached their duty to adequately inform.  Accordingly, her claim arises out of

negligence and falls outside of the reach of Section 2680(h).  *Compare with Franklin*, 992 F.2d

at 1497 (finding a battery because physicians operated on an incompetent patient without his

wife's substituted consent, but holding that an equivalent of 10 U.S.C. § 1089(e) ensured that the

Veterans Administration waived sovereign immunity).  Plaintiffs' claim is therefore actionable

under the FTCA, and the Court possesses the jurisdiction necessary to resolve this action.[3]

---

[3] Even if Plaintiffs' claim were somehow considered arising from a "battery," Plaintiffs
claim still would likely be actionable before this Court against Defendant for two reasons.  First,
numerous courts have held that 10 U.S.C. § 1089(e) waives sovereign immunity to battery claims
based on a lack of consent to surgical procedures brought against military physicians.  *See, e.g.*,
*Keir v. United States*, 853 F.2d 398, 409-11 (6th Cir. 1988); *Newman v. Soballe*, 871 F.2d 969,
972-73 (11th Cir. 1989).  Second, other courts have circumvented the "battery" issue by
regarding medical batteries as only "technical" batteries that should escape the reach of Section
2680(h).  *See Woods v. United States*, 720 F.2d 1451, 1453-54 (9th Cir. 1983); *Lane v. United*
*States*, 225 F. Supp. 850, 852-53 (E.D.Va. 1964).

*B.      Informed Consent*

The plaintiff in a medical malpractice suit must establish by a preponderance of the evidence:  (1) the applicable standard of care; (2) a deviation from or breach of that standard by the defendant; and (3) a causal relationship between that deviation or breach and the plaintiff's injury.  *See Randall v. United States*, 850 F. Supp. 22, 30 (D.D.C. 1994) (citing *Kosberg v. Washington Hosp. Ctr.*, 394 F.2d 947, 949 (D.C. Cir. 1968)); *see also Ornoff v. Kuhn & Kogan Chartered*, 549 A.2d 728, 731 (D.C. 1988).  In order for a plaintiff to meet the required burden of proof, "[the] plaintiff must affirmatively prove the relevant recognized standard of care exercised by other physicians and that defendant departed from that standard when treating the plaintiff." *Robbins v. Footer*, 553 F.2d 123, 126 (D.C. Cir. 1977).  Importantly, the court must look to the national standard of care for comparative purposes.  *See Morrison v. MacNamara*, 407 A.2d 555, 564 (D.C. 1979); *Capitol Hill Hosp. v. Jones*, 532 A.2d 89 (D.C. 1987).  To establish proximate cause, "the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between defendant's breach of the standard of care and the plaintiff's injuries *and* that the injuries were foreseeable."  *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 624 (D.C. 1986).

"Ordinarily, in a medical malpractice case, expert testimony is required in order to prove the proper standard of care and causation."  *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 368 (D.C. 1980) (citations omitted); *Psychiatric Inst.*, 509 A.2d at 624.  Although there are cases which do not require expert testimony on the issue of breach, i.e., cases "[w]here laymen can say, as a matter of common knowledge and observation, that the type of harm would not ordinarily occur in the absence of negligence," *Harris v. Cafritz Mem'l Hosp.*, 364 A.2d 135, 137 (D.C.

24

1976), expert testimony is required "if a case involves the merits and performance of scientific treatment, complex medical procedures, or the exercise of professional skill and judgment, [because] a jury will not be qualified to determine whether there was unskillful or negligent treatment without the aid of expert testimony," *id.*; *see also Nimetz v. Cappadona*, 596 A.2d 603, 606 (D.C. 1991) (expert testimony is required when "the subject presented is 'so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson'") (quoting *Dist. of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987)); *Canterbury*, 464 F.2d at 785-87 (prevailing medical practice must be considered when medical judgment is at issue; ordinarily, only the physician is in a position to identify particular dangers).

To establish a prima facie case in an informed consent action, the plaintiff must show:

1.  the doctor failed to inform plaintiff of certain risks of the medical procedure, *Canterbury*, 464 F.2d at 785;

2.  the undisclosed risks were "material," *i.e.*[,] the reasonable person, in what the physician knows or should know to be the plaintiff's position would be likely to attach significance to the allegedly undisclosed risks in deciding to accept or to forego the proposed treatment, *id.* at 787;

3.  the prudent person, in the plaintiff's position, would have decided to decline treatment if suitably informed of all perils bearing significance, *id.* at 791;

4.  the undisclosed risk actually manifested itself and caused the damage for which plaintiff seeks recovery, *Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C. 1984).

*Blincoe v. Luessenhop*, 669 F. Supp. 513, 516 (D.D.C. 1987). "At trial, the plaintiff bears both the burden of production and the risk of non-persuasion on these elements." *Id.* (citing *Canterbury*, 464 F.2d at 791). Importantly, a physician is not required to disclose all risks; rather, only material risks must be disclosed. *See Crain*, 443 A.2d at 562 (citations omitted).

25

Additionally, a physician need not advise a patient of risks that the patient already has actual knowledge. *Id.* (citations omitted). "[A]t a minimum, the physician must disclose the nature of the condition, the nature of the proposed treatment, any alternative procedures, and the nature and degree of the risks and benefits inherent in undergoing and in abstaining from the proposed treatment." *Id.* (citations omitted). "Consent obtained without divulging this information is ineffective to grant the physician permission to institute the proposed treatment." *Id.* (citing *Scott v. Bradford*, 606 P.2d 554, 556-57 (Okla. 1979)).

In order to establish what disclosures are material, expert testimony is not needed to establish the scope of or the breach of the duty to inform one's patients before treating them; however, expert testimony is necessary to establish the nature and degree of the risks of the proposed and alternate treatments, the probability of therapeutic success, and whether disclosure would be detrimental to a particular patient. *See id.* at 563 (citation omitted). Moreover, while a patient's testimony is relevant on the issue of causation, the test of causation is objective: what a prudent person in the patient's position would have decided if informed of all relevant factors. *Id.* at 564 n.14 (citing *Canterbury*, 464 F.2d at 791); *see also Randall*, 859 F. Supp. at 31; *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 561 & n.19 (D.C. 2001).

### III: DISCUSSION -- FINAL FINDINGS OF FACT

As evident from the Preliminary Findings of Fact set out in this Memorandum Opinion, two distinct questions are currently before the Court, each of which contains some material facts that are in dispute which require resolution by the Court. Taken in reverse order, the first issue concerns whether the physicians employed by Walter Reed met the standard of care of reasonably prudent practitioners in the District of Columbia acting under the same or similar

circumstances in providing care to Mrs. Schauffert.  Under this issue, the Court shall explore

whether Mrs. Schauffert's physicians could have actually conducted an operation within the

standard of care if her doctors followed the procedures she now proposes -- i.e., an intra-

operative, *in situ* biopsy of her ovarian tissue and the retention of certain reproductive material

and organs rather than a bilateral salpingo-oophorectomy and total abdominal hysterectomy,

which involved the complete removal of Mrs. Schauffert's ovaries, fallopian tubes, and uterus.

Defendant admits that Mrs. Schauffert was not provided counseling related to the possibility of

an intra-operative, *in situ* biopsy of her ovarian tissue with the retention of certain reproductive

organs.  *See, e.g.*, Def.'s Suppl. Proposed Findings of Fact at 20-23, ¶¶ 24-31.  If such an

operation was viable and fell within the standard of care, Defendant may well have breached its

duty to inform Mrs. Schauffert of a plausible alternative treatment.  The second issue concerns

whether Mrs. Schauffert's physicians properly obtained her informed consent before

commencing the surgery they did perform on her.  Under this issue, the Court shall investigate

whether Mrs. Schauffert's physicians at Walter Reed properly informed her of the nature of the

actual operative plan.

> A.    *Plaintiffs' Proposed Operation Falls Outside of the Standard of Care*

1.  Upon a searching examination of all testimony adduced on the subject, the Court

concludes that Plaintiffs have failed to meet their burden of production and persuasion on their

theory that the physicians at Walter Reed were required to offer Mrs. Schauffert the option of

undergoing an intra-operative, *in situ* biopsy of her ovarian tissue.  Rather, the Court finds that

the standard of care for her medical condition did not require that Mrs. Schauffert's physicians

offer her the option of performing a surgical procedure by which they would attempt to leave

some of her ovarian or uteran tissue by excising portions of her ovaries or uterus for intra-operative biopsy.

2.  Having observed their demeanor and weighed their testimony upon direct and cross-examination, the Court credits the testimony of Drs. Macri, Carlson, and Barter in this area. Simply, Defendant introduced the testimony of three separate gynecologist-oncologists who are experts in this specialized field.  Each of these experts uniformly testified that it would not be within the standard of care to conduct an intra-operative biopsy of ovarian tissue for two reasons: (1) regardless of whether the ovarian tissue was ruptured or unruptured, it would be impossible to ascertain with any degree of medical certainty whether the ovarian tissue left in the body contained any malignant cells, *see* 10/29/04 Tr. at 111:1-21; J. Ex. 21 (Carlson Dep.) at 37-37:1-21; and (2) an intra-operative, *in situ* ovarian biopsy would expose the patient to the unacceptable risk of accidentally rupturing a cancerous cyst, thereby spilling the contents into the peritoneal cavity, increasing the patient's cancer staging, and possibly spreading the cancer, *see* 10/27/04 Tr. at 113:14-25, 114:21; 10/29/04 Tr. at 111:1-21.  Given these two major concerns and Mrs. Schauffert's expressed desire to be cancer-free, such an operation would have been highly dangerous and not necessarily effective.

3.  Plaintiffs did proffer the testimony of Dr. Charles Seigel, which contravened -- in part -- the testimony offered by Defendant's experts.  Dr. Seigel, who has been a board-certified gynecologist since 1976, is not an oncologist, has never lectured on gynecologic oncology, and has never published an article on the subject.  Certainly, "a physician need not be a specialist in the field of which he speaks in order to testify as an expert."  *Baerman v. Reisinger*, 363 F.2d 309, 310 (D.C. Cir. 1966) (quoting *Sher v. De Haven*, 199 F.2d 777, 782 (D.C. Cir. 1952), *cert.*

*denied*, 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed 1363 (1953)).  While an expert, Dr. Seigel appeared

quite uncomfortable in rendering an opinion as to the standard of care for an OBGYN-oncologist.

Dr. Seigel admitted that obstetrical oncologists were better equipped to diagnose the risk of

leaving or not leaving a cyst in the body during surgery, J. Tr. Ex. 20 (Seigel Dep.) at 60:3-12,

noting that he "would defer to them [oncologists] in the present day and age as opposed to 35

years ago when I was doing it msyelf," *id.* at 60:14-17.  He also stated that he would "more

likely" consult with an obstetric oncologist before he would feel comfortable handling a patient

with symptoms identical to those of Mrs. Schauffert.  *Id.* at 18:12-15, 51:1-7.  In addition to

admitting that his "techniques are a lot older now," *id.* at 47:14, Dr. Seigel also evinced

uncertainty at various points, frequently answering "I don't think so" when asked about relevant

issues, *id.* at 44:22-23, 45:1, 6-8.  As such, with his limited background and comparative lack of

experience with the specific issues at hand, the testimony offered by Dr. Seigel that contradicted

Defendant's experts was simply less credible and had significantly less substantiation.

    4.  Moreover, Dr. Seigel's testimony was not contradictory to the testimony provided by

Defendant's experts in many respects.  For instance, Dr. Seigel testified that the best course of

action for doctors during the surgery was to remove the right non-ruptured cyst and ovary to

avoid the risk of spillage from a malignant cyst.  *Id.* at 32:6-24.  Moreover, he noted that if the

left ovary had a remaining cyst as the laboratory report indicates, then removal of the entire left

ovary was also appropriate.  *Id.* at 35:15-20, 57:17-22, 65:6-24, 81:4-15.  Indeed, he agreed that

if Mrs. Schauffert's primary concern was to be free of cancer, her surgery as done by the

physicians at Walter Reed was the correct course of action, as the doctors could not have saved

either ovary if they were to obtain a definitive diagnosis of whether she had cancer.  *Id.*

Ultimately, Dr. Seigel did not testify that the Walter Reed physicians should not have performed a total abdominal hysterectomy; rather, to the extent that his opinion conflicted with those of Defendant's experts, the conflict was based -- at least in part -- on his erroneous assumption that the apparently-ruptured left ovary was of normal size on pathology, and therefore was not an additional cyst.  J. Tr. Ex. 20 (Seigel Dep.) at 62, 75.[4]  Finally, while Dr. Seigel expressed support for the *in situ* biopsy option given certain circumstances, he noted that the duty to inform a patient of that option was contingent upon the patient affirmatively expressing the desire to retain as much tissue as possible, *id.* at 35:15-23; Mrs. Schauffert, upon cross-examination, conceded that she did not express a desire to the physicians to have as little ovarian or reproductive tissue removed as possible, 10/26/04(b) Tr. at 77:25, 78:13.

5.  Given the strength of the testimony provided by Defendant's experts, the superior qualifications and expertise of those experts in the specific field at issue, and the large degree of overlap between the testimony provided by Plaintiffs' expert and that of Defendant's experts, the Court concludes that an intra-operative, *in situ* biopsy of Mrs. Schauffert's ovarian tissue would not have been within the standard of care, as it could not have ensured that Mrs. Schauffert was cancer-free and -- due to the increased danger from a rupture -- could have actually increased her cancer staging.  While physicians certainly have a duty to inform their patients of medically viable options within the standard of care, the physicians at Walter Reed simply had no duty to inform Mrs. Schauffert of her now-desired style of surgery.

---

[4]  Defendant demonstrated at trial that whether or not the left ovary was ruptured, it was certainly enlarged, and therefore it was pathologically no different from the unruptured right ovary and any attempt to dissect it *in situ* would be medically dangerous and against the standard of care.  10/27/04 Tr. at 161-65; 10/29/04 Tr. at 116-23.

   B.      *Mrs. Schauffert Was Provided With Adequate Counseling and Gave Her Informed*
           *Consent to the Operation That Took Place*

   1.  Because the Court has concluded that it would not have been within the standard of

care to provide Mrs. Schauffert counseling regarding an intra-operative, *in situ* biopsy, the

remaining issue regarding the counseling received by Mrs. Schauffert and the subsequent level of

her consent is:  "What counseling did Mrs. Schauffert receive, and what did she understand as a

result of that counseling?"  Having observed the demeanor of Mrs. Schauffert during her

testimony, the lack of clarity in her recollection of several key events, and her oft-contradictory

responses upon cross-examination, the Court does not credit Mrs. Schauffert's testimony to the

extent that she testified that (1) the physicians at Walter Reed did not provide an explanation as

to the extent of the surgery planned, i.e., a bilateral salpingo-oophorectomy and total abdominal

hysterectomy, which involved the complete removal of Mrs. Schauffert's ovaries, fallopian

tubes, and uterus, or (2) that if the physicians did attempt to provide an explanation, she did not

adequately understand the nature of the surgery.

   2.  Rather, numerous factors have persuaded the Court that Defendant provided the

necessary counseling vis-á-vis the surgery undertaken.  First, it is undisputed that Mrs. Schauffert

knows and understands English well, and is a highly educated and intelligent individual.

Moreover, Mrs. Schauffert has proven to be both motivated and inquisitive, obtaining as much

information on the subject of her condition and possible surgeries while in Italy, before traveling

to Walter Reed for an operation.  Given Mrs. Schauffert's intelligence, capacity, and motivation,

the Court considers it unlikely that she would have undergone counseling on June 20, 1999 and

June 21, 1999, and signed two clear consent forms without understanding the content of those

discussions and consent forms or objecting and asking basic questions.

3. <u>Second</u>, Mrs. Schauffert's medical records, created contemporaneously during the events leading up to her July 21, 1999 surgery support Defendant's claim that Mrs. Schauffert was specifically counseled on the nature and breadth of the planned surgery on multiple occasions.  Indeed, these records -- quite clear in their language and drafted by multiple physicians -- are in many ways more reliable than the recollections of individuals over five (5) years after the events in question.  These records show:  (1) Mrs. Schauffert was counseled twice, once on June 20, 1999, and once on June 21, 1999; (2) different physicians conducted the pre-operative counseling; (3) Mrs. Schauffert stressed that she wished to be "cancer-free" after being told that with her condition she had a thirty percent (30%) chance of having cancer; (4) the need for Mrs. Schauffert to undergo a bilateral salpingo-oophorectomy and total abdominal hysterectomy in order to be cancer-free was emphasized; (5) the meaning of those terms and the scope of the operation was explained; and (6) Mrs. Schauffert's only questions focused on the condition of her resulting scar, and she evinced no confusion regarding the planned surgery.  *See generally* J. Tr. Ex. 1.

4. <u>Third</u>, Dr. Shad Deering, witness for Defendant, testified in a more persuasive and credible manner than Mrs. Schauffert concerning the extent and type of counseling provided.  Importantly, Dr. Deering's testimony, corroborated by notations in Mrs. Schauffert's contemporaneous medical records, was also supported by the two consent forms signed by Mrs. Schauffert prior to her surgery, on June 20, 1999 and June 21, 1999.  Each of these forms was quite clear regarding the scope of the surgery.  The first form, entitled "A Request for Administration of Anesthesia and for Performance of Operations and Other Procedures,"  J. Tr.

32

Ex. 11, specifically noted that the operation Mrs. Schauffert was to undergo was an "exploratory laparotomy, bilateral salpingo-oophorectomy, total abdominal hysterectomy, possible staging operation." *Id.*  As Dr. Deering wrote in the "Statement of Request," the surgeons were "[t]o make incisions in the abdomen to evaluate and remove one of both ovaries/the mass/possibly uterus/fallopian tubes/lymph nodes/omentum/pelvic washings." *Id.*  Mrs. Schauffert read this form and signed it in the presence of a witness on June 20, 1999. *Id.*  Due to a change in her operating team, Mrs. Schauffert was provided a second consent form before her surgery on July 21, 2004, that was even more clear; the second form read on the first handwritten line: "Exploratory Laparotomy/Total Abdominal Hysterectomy/Bilateral Salpingo-oophorectomy with possible staging." J. Tr. Ex. 12.  The form also noted:  "plan is to remove uterus, fallopian tubes, ovaries, the mass, and possibly lymph nodes, and any other involved tissue or organs." *Id.*  Mrs. Schauffert signed this consent form as well. *Id.*  These forms are quite clear and, having been read and signed by someone with Mrs. Schauffert's intelligence and level of English, clearly spell out the planned surgery and are consistent with the actual operation as it occurred. Moreover, the existence of these multiple forms, provided to Mrs. Schauffert on separate occasions over a two-day span, supports the testimony of Defendant's witnesses that specific, adequate counseling occurred.

     5. <u>Fourth</u>, it is undisputed that Mrs. Schauffert never complained to Dr. Deering regarding the fact that her ovaries were removed without her consent; rather, she admitted at trial that her only complaint to him after surgery was the alignment of her scar.  10/26/04(b) Tr. at 6:8-25.  Moreover, despite the fact that Mrs. Schauffert had eighteen (18) documented discussions with her primary care providers between August 1999 and June 19, 2000, none of her

medical records from this time indicate that she raised any complaints regarding her claimed non-consent to the removal of her ovaries. Indeed, Mrs. Schauffert admitted that she never discussed the surgery during this time with her primary physician, Dr. Kass. *Id.* at 9:18-25. While Mrs. Schauffert testified during trial that she complained about the removal of her ovaries and uterus to Dr. Bales immediately upon her return to Italy, no records support Mrs. Schauffert's contention and at trial Dr. Bales testified that Mrs. Schauffert did not raise any concerns regarding the removal of her reproductive organs at Walter Reed, but only complained about her surgical scar. 10/29/04 Tr. at 21:21-23, 22:1-11. While Plaintiffs claim that no official complaints were filed due to a fear of retaliation while John Schauffert served in the United States military as a Lieutenant Colonel during this time, the Court finds that explanation to lack credibility: Lt. Col. Schauffert was an experienced officer in the military, was admittedly aware of the military's complaint and investigation procedure, and was certainly familiar with the fact that employees of the United States government frequently bring complaints or litigation relating to real or perceived harms. Moreover, Mrs. Schauffert could have expressed her concerns without necessarily filing a formal complaint; however, she did not do so for eleven (11) months. Ultimately, given that (1) roughly eleven months passed between the time of Mrs. Schauffert's surgery and any documented complaint, (2) Plaintiffs presented no outside testimony supporting any complaints during this time period, and (3) it was during this period that the negative side-effects of Mrs. Schauffert's hormone treatment began to take their toll, the Court finds it unlikely that Mrs. Schauffert did not understand or consent to the actual surgery that occurred; rather, the Court finds that it is more likely true that Mrs. Schauffert developed an *ex post facto* antipathy to her surgery after experiencing negative side-effects related to her hormone treatment. This *ex*

*post facto* antipathy -- buoyed by the knowledge that her condition turned out to be benign -- has

led Mrs. Schauffert to retrospectively question her decision to undergo the "exploratory

laparotomy, total abdominal hysterectomy, bilateral salpingo-oophorectomy with possible

staging" surgery.  The fact that nearly eleven (11) months passed between the time of her surgery

and her first medically documented complaint supports such an inference -- i.e., that Mrs.

Schauffert came to question her decision only after experiencing side effects and finding out that

she did not have cancer.

6.  <u>Fifth</u>, if Mrs. Schauffert's primary concern was to be assured that she was free of

cancer, as it admittedly was at the time of the operation, the physicians at Walter Reed took all

the necessary steps to ensure that result, given the condition encountered during Mrs.

Schauffert's surgery.  While Mrs. Schauffert now claims that she understood that the operation

would involve an intra-operative, *in situ* biopsy, Plaintiffs presented no evidence indicating that

*any* doctor, either in Italy or Walter Reed, discussed such a procedure with her; moreover, the

physicians at Walter Reed were unanimous in testifying that they would not have performed such

an operation and would not have provided counseling on such an "option."  Rather, they

considered such an operation to be outside the standard of care.  Mrs. Schauffert may now assert,

after the fact, that the side effects of her surgery and hormone treatment are so severe that she

feel that "[s]ometimes I wish I had cancer," 10/26/04(b) Tr. at 12:25-13:1; however, while such

obsessing over certain issues and gazing through retrospective glasses may lead her to conclude

that she was supposed to be given an intra-operative, *in situ* biopsy that would leave some

portion of her ovaries or uterus, it is clear that at the time of the surgery, (1) Mrs. Schauffert

expressed a deep fear of cancer and a desire to be "cancer-free"; (2) she never expressed a desire

to have as little ovarian or reproductive tissue removed as possible; (3) no other operation within the standard of care would have ensured that she was "cancer-free"; and (4) the intra-operative, *in situ* option was never discussed with her by the physicians at Walter Reed.

7.   Given these considerations, the Court concludes that the physicians at Walter Reed adequately informed Mrs. Schauffert of the nature of her condition, the nature of the proposed treatment, any alternate treatment procedures within the standard of care, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment.   Simply, the Court finds that (1) given Mrs. Schauffert's intelligence, capacity, and motivation and the Court's observation of her on the witness stand, it is unlikely that Mrs. Schauffert did not comprehend the content discussed in her two pre-operative counseling sessions, and her contrary testimony lacks credibility; (2) her medical records, created contemporaneously, provide strong support for an inference that she was afforded adequate counseling and gave her informed consent to the operation actually undertaken; (3) the credible testimony of Dr. Deering, in combination with the two detailed, specific consent forms signed by Mrs. Schauffert prior to her operation, supports the adequacy of the counseling provided; (4) the fact that nearly eleven months passed between Mrs. Schauffert's operation and her initial complaint to any medical personnel supports an inference that Mrs. Schauffert was aware of the operative plan and did not object until she began experiencing unpleasant side effects from her hormone treatments in the months following the operation; and (5) given that no doctor testified that he or she counseled Mrs. Schauffert on the option on an intra-operative, *in situ* biopsy, and the fact that such an option would have fallen outside the standard of care, Mrs. Schauffert's current desire to have undergone an intra-operative, *in situ* biopsy represents nothing more than

36

wishful thinking given the hindsight that her condition was ultimately benign.

## IV:  CONCLUSIONS OF LAW

1.  The operation provided to Mrs. Schauffert on July 21, 1999 -- a bilateral salpingo-oophorectomy and total abdominal hysterectomy, which involved the complete removal of Mrs. Schauffert's ovaries, fallopian tubes, and uterus -- was within the standard of care of a reasonably prudent practitioner operating in the District of Columbia acting under the same or similar circumstances in providing care.  Drs. Deering, Macri, Rose, Remenga, Sundborg, and Ochoa exercised reasonable care and skill in evaluating Mrs. Schauffert's ovaries, cysts, and uterine mass, and in recommending and performing surgery.  The type of operation hinted at by Plaintiffs' expert, Dr. Seigel,  and focused upon by Plaintiffs -- an intra-operative, *in situ* biopsy that would have left some portion of Mrs. Schauffert's ovaries or uterus -- was not within the standard of care given Mrs. Schauffert's condition, her thirty percent (30%) risk of cancer, her desire to have no more children, and her expressed wish to be "cancer-free."

2.  Because an intra-operative, *in situ* biopsy would not have been within the standard of care, the physicians at Walter Reed did not have a duty to inform Mrs. Schauffert of such an "option."  Without a duty to inform, the physicians' admitted failure to disclose the "option" did not constitute a breach of any duty.  Simply, a reasonably prudent person in Mrs. Schauffert's position would not have decided to undergo such an operation, and should not have been informed of such a technique.  Accordingly, Plaintiffs cannot and have not established by a preponderance of the evidence either a duty, breach, or causation as required on the alleged failure to inform the patient of viable alternative treatments.  As such, the physicians at Walter Reed were not medically negligent in the options offered to Mrs. Schauffert.

3.   The actual counseling provided by the physicians at Walter Reed on July 20, 1999 and July 21, 1999, as memorialized in Mrs. Schauffert's medical records and two separate consent forms, adequately disclosed the nature of Mrs. Schauffert's condition, the nature of the recommended treatment, the two other alternate treatment procedures that fell within the standard of care, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment.

4.   The communications between the physicians at Walter Reed and Mrs. Schauffert were not unreasonably inadequate and do not justify an imposition of liability.  Plaintiffs have failed to meet their burden of persuasion on the issue of deviation from the appropriate standard of care: Plaintiffs have not established by a preponderance of the evidence that (1) Mrs. Schauffert's counseling was insufficient in that she was not informed of any material facts relating to her surgery; (2) Mrs. Schauffert did not consent to the surgery without being fully aware of or fully informed of such material fact; or (3) that a reasonably prudent patient under similar circumstances would not have consented to the surgery if informed of such material fact or facts. Rather, all material information was disclosed to Mrs. Schauffert, who then provided her informed consent to the operation as constituted.

## V: CONCLUSION

For the reasons set forth above, the Court finds that Defendant is not liable to Plaintiffs.

Judgment is awarded in Defendant's favor, without costs to either party.  The Clerk is directed to

prepare a judgment and close this case.


Date:   September 18, 2005

                                  _____/s/_____
                                  COLLEEN KOLLAR-KOTELLY
                                  United States District Judge